## The Dry Dock Bank *vs.* The American Life Insurance and Trust Company and others.

The statute against usury prohibiting a greater rate of interest than seven per cent per annum " for the loan or forbearance of any money, goods or things in action," is applicable only to those loans which are in substance and effect loans of *money*.

The intention of the statute, it seems, is to prohibit more than seven per cent upon direct loans of money, and loans of money made *indirectly* by way of loan of goods and things in action.

A loan of goods or of a chose in action, unless intended as a mere cover for a loan of money, is not within the statute; nor is a loan of stock or grain to be returned in kind; nor a loan of money produced by the sale of shares of stock, where the agreement is that the borrower shall replace the stock.

By the term " chose in action," as used in the statute, is meant a particular species of property, which on the death of the owner would go to his representatives. The *credit of the lender* is not a chose in action, or property at all in his hands, and is not within the statute to prevent usury.

An exchange of notes therefore, or other obligations, for a premium greater than the legal rate of interest, where the transaction is not a mere disguise for usury, is not prohibited by the statute.

And in all cases where the contract is in form one of sale or exchange, if the court, in looking at the whole transaction, can see that the value secured to the vendor was in good faith but the price of the thing sold or exchanged by him, there can be no usury, whatever the price may be, or the mode in which it may be secured.

Where, however, the object of the parties is a *loan of money*, and something else under the form of a sale or an exchange *is* substituted for it, the principal of

The Dry Dock Bank *v.* The American Life Ins. and Trust Co.

the loan or debt will be the value in money received by the nominal vendee; and any consideration paid or secured to the vendor beyond that will, in general, be considered as interest for the forbearance, and such cases are within the statute.

A bank in New-York which had suspended specie payments, and was under injunction, appointed a committee to procure a loan sufficient to enable it to resume its business. The committee applied to the defendants, a trust company, professing to loan money, "*for aid to enable the bank to resume specie payments.*" The trust company agreed to issue their certificates of deposit bearing *five per cent* interest, payable in London, part within one, and part within two years, for £48,000 sterling, on receiving the bills of credit or promisory notes of the bank, for £50,000 sterling, bearing interest at *six per cent,* payable in London, at the rate of $5 for each £1 sterling in installments at four, five, six and seven years, the interest to be paid half yearly. The notes of the bank were to be secured by a conveyance of real estate, of sufficient value, to trustees, containing a provision that the bank should pay the respective installments of the £50,000 to the trust company in New-York, with interest *at seven per cent,* at least forty days before such payments would fall due in London, valuing each pound sterling at $5. It was understood by the parties that the trust company would negotiate the obligations of the bank in London with their own guaranty, in order to meet their certificates of deposit. The arrangement was consummated accordingly, each bill of credit issued by the bank, reciting that the amount specified therein was part of *a loan of £50,000 sterling,* charged on real estate. It appeared to have been understood between the parties, that the trust company was not in a situation to loan in cash the amount required by the bank; that the necessities of the latter were known to the company; also that the parties contemplated that the certificates of deposit, to be issued by the company, were to be and could be converted *into money* at par, or about par; but in fact the bank sustained a loss in the sale of the certificates of over $12,000. *It was held,* 1. That the transaction was in substance a *loan of money* by the trust company to the bank; 2. That the contract was usurious, and therefore that the bills of credit or notes issued by the bank, and the trust deed of real estate to secure the same, were void.

THE bill in this case was filed before the chancellor, in September, 1842, by the New-York Dry Dock Company. Its object was to have certain bills of credit issued by the complainants and delivered to the defendants, The American Life Insurance and Trust Company, and also a trust deed, executed by the former, to M. Robertson, J. Duer and A. Crist, as trustees, to secure their payment, declared void for usury and cancelled.

The cause was heard on pleadings and proofs, by the assistant vice chancellor of the 1st circuit, and a decree pronounced declaring the bills usurious and the deed of trust void. (*See* 3 *Sandf.*

*Ch. Rep.* 215.) This decree was reversed on appeal to the supreme court sitting in the first district, and the bill dismissed with costs. From that decree the complainants appealed to this court, where the decree of the supreme court was reversed and that of the vice chancellor affirmed.

The following statement of facts, admitted by the pleadings, or established by the proofs, is all that is deemed essential to a proper understanding of the judgment of this court.

The complainants, a banking corporation doing business in the city of New-York, suspended payment in May, 1838, and shortly afterwards were placed under an injunction, and their property transferred to receivers. While in this situation, and on the 9th of May, a resolution was adopted by the board of directors, appointing a committee " to *endeavor* to *procure a loan sufficient to enable the company to resume their business.*" The committee subsequently applied to the defendants, the American Life Insurance and Trust Company, through the agent and vice president of the latter Mr. Duer. The trust company was also a corporation transacting business in New-York, with a capital of $2,000,000, and then professing to loan money ; and having among other powers, the right to receive any deposit of money or securities *valued as money,* and allow interest thereon, &c. The answer of the defendants alledges that the application to the trust company was "*to aid the said bank,* so as to enable them to *resume specie payments.*"

The negotiation thus commenced, resulted on or before the 24th of July, in the agreement following : 1. The trust company were to issue their certificates of deposit, for £48,000 sterling, payable in London with interest at five per cent, part in 1839, and part in 1840, which the complainants were to receive. 2. The Dry Dock Company were to deliver to the trust company their own bills of credit for £50,000, payable to the latter in sterling money at $5 to the pound in London, the interest to be paid half yearly at six per cent per annum, and the principal sum in installments, £10,000 in July, 1842 ; £10,000 in July, 1843.; £10,000 in July, 1844, and £20,000 in July, 1845. But instead of paying these bills of credit in London, the bank

was to pay the principal in the city of New-York, with semi-annual interest at seven per cent, valuing each pound sterling of the principal at $5, and such payments to be made in every instance at least 40 *days previous* to the time they would fall due in London. The whole sum of £50,000, with interest at seven per cent was to be secured upon the real estate of the bank worth double the amount. The Bank was to allow one per cent on the above amount, or $2500, to Mr. Duer, the vice president of the trust company, to be paid on the consummation of the agreement, and for his benefit.

It was also agreed during the negotiation, that Mr. Duer should have one thousand shares of the stock of the bank, at the then market price, or a little less, for his personal benefit. The expectation being that it would advance in market on the consummation of the arrangement.

The committee of the complainants, on the 7th of June, 1838, reported to the directors of the Banking Company the conditions agreed upon for obtaining the loan, and the report was adopted. On the day following the committee adjusted the claim arising from the contract for the 1000 shares of stock, as follows: The trust company had furnished $20,000 to purchase the stock, which had advanced to par. And the loan committee of the bank, in pursuance of a resolution to that effect, gave a note for $7334,87 to the trust company, with interest, being the difference between the contract price and the then value of the stock. This, with interest, was subsequently paid by a post note of the bank, and the payment acknowledged by the secretary of the trust company.

The complainants executed their bills of credit for £50,000, payable to the order of Duer as vice president of the trust company, and delivered them to the latter. Also a trust deed upon real estate of the bank appraised on oath, by persons agreed upon by the respective parties, at over $500,000. Each bill of credit recited that the amount specified therein was "*part of a loan of £50,000 sterling*," charged on unincumbered real estate worth double the sum charged thereon. The abstract of title

and the deed of trust was prepared by the solicitor and at the expense of the Dry Dock Company, and approved by Mr. Duer. The deed among other things recites that "the Dry Dock Company have determined to issue their sterling bills," describing them, and that the trust company had agreed to *guaranty* the payment, and to pay the bills so issued, and interest thereon in London as they should become payable, without any *charge* for *remittance, difference* of *exchange, commission,* or *otherwise* to the Dry Dock Company. The said company agreeing to pay to the trust company the interest on said bills at the rate of 7 per cent per annum, half yearly, valuing each pound sterling of the principal at $5, at least 40 days previous to the time they shall respectively fall due in London, and also to pay the amount of said bills at the same valuation of the pound sterling 40 days previous to their becoming due in London.

It was proved that the true value of the pound sterling was $4.87, or a fraction less. And the expense of making remittances to London about 2 per cent. The complainants also paid to Mr. Duer the $2500 as above stipulated.

The trust company on their part issued and delivered to the complainants their certificates for £48,000, with interest at 5 per cent, included for the time they had to run, one half being payable in London in July, 1839, the residue in July, 1840.

It appeared that in an early stage of the negotiation it was understood by both parties that the trust company was not in a situation to loan money to the amount required. That the situation of the complainants, and the necessity on their part of obtaining immediate pecuniary aid, to meet their engagements and relieve them from their embarrassments, was also fully understood. That the terms upon which the certificates could be converted into money, was a subject of conversation, and that the agents of the respective parties went together to the brokers in New-York for the purpose of ascertaining the advance in money which could be obtained upon them. It also appeared that the trust company supposed that they could be disposed of at par, and the committee of the complainants that they would bring

par within one or two per cent. The loss sustained upon their sale, however, exceeded $12,000.

Mr. Duer, who was examined as a witness by the defendants in his deposition stated that the trust company issued their certificates in exchange for the bills of credit of the complainants, and the £2000 difference in amount was intended as a compensation for the services they were to perform and the risks they undertook. Two of the members of the committee appointed by the complainants, on the other hand deposed, that the application was for a loan, and resulted in a loan of £48,000 in the certificates above mentioned.

A question of variance between the agreement alledged in the bill, and the evidence, arose in the cause, the particulars of which are omitted.

The trustees named in the indenture executed to secure the payment of the bills of credit, together with Mr. Morrison, who held £47,000 of those bills as collateral security for a debt due him from the trust company, were made parties as defendants to the bill.

*S. Beardsley,* for appellant. The bills of credit or post notes of the Dry Dock Company and the trust deed to secure their payment, were usurious.' It is unnecessary in this case, to discuss or determine how far, if at all, a person may lawfully contract for a compensation, above or below the amount of legal interest, on the sale, exchange or loan of his credit, as the transaction in question was of another description and character. It was for every purpose, in fact, as in most respects it was in form, a direct loan of money. The avowed and only object of the application in 1838, by the Dry Dock Company to the Trust Company, was to obtain a loan of money, or, what in effect was identical, "to obtain the means of raising funds," as stated by Mr. Duer in his evidence; and the means agreed upon and resorted to for the purpose, excluding minor, and, as respects the present point, irrelevant parts of the transaction, were an engagement by the Trust Company to loan to the Dry Dock

Company £48,000 sterling, to be advanced in London in three installments, the first in July, 1839, and the last in July, 1840 : to be repaid by the Dry Dock Company in New-York, in four installments, amounting to $250,000, the first in 1842, and the last in 1845. Here then, saying nothing of other parts of the transaction, was to be a direct loan of £48,000, in money. The difference between the amount to be loaned and the amount to be repaid, taking into the account interest, as provided for in the contract, and the expense of transmitting the sum to be loaned from New-York to London, will show, beyond all question, that the Trust Company was to receive for the loan and forbearance of the sum to be advanced, greatly beyond the legal rate of interest.

The difference between the nominal amount to be loaned and that to be repaid, was, however, but a part of the usurious exaction ; for, in the *first* place, the sum to be loaned was to carry interest, until actually advanced, at 5 per cent, whereas the amount to be repaid was at 7 per cent the whole time. (2.) An allowance of $2500 was agreed to be made, and was actually made, to Mr. Duer, the vice president and agent of the Trust Company, in order to obtain the loan. (3.) He was also to have 1000 shares of the stock of the Dry Dock Company at a price greatly below its value, and on which there was a loss to said company of $7334,37. (4.) The certificates issued by the Trust Company, for the £48,000 sterling, which, as was known, were to be disposed of to raise the money, were, as was also well known, not worth par, and in converting them into cash, the Dry Dock Company lost $12,429,10.

It is conceded there can be no usury where there is no loan ; or forbearance, which is but a loan of the amount forborne. The term *loan*, however, has various significations in the law, as where a thing is loaned to be returned *in specie*, and also where there is not to be a specific return, but one *in genere* only. (*Ord on Usury*, 23 *to* 25 ; 2 *Kent's Com. 5th ed.* 573 ; *Story on Bailm. 3d ed.* §§ 6, 219, 228, 370 *a*, 415 *a*, 439 ; *Addison on Cont.* 850, 1 ; *Earl of Chesterfield* v. *Janssen*, 2 *Ves. sen.* 153.)

The Dry Dock Bank *v.* The American Life Ins. and Trust Co.

The statute of usury applies only to a loan of money, or to a transfer of something else as money, or for the purpose and as the means of obtaining money on time. Every loan which falls within the statute is, therefore, virtually, if not in form, *a loan of money.* Such loans are *express,* where the money is advanced by the lender, and *implied* where something else is parted with for the purpose of obtaining the money. Every such transaction, the real object being to procure money on time, no matter what form it is made to assume, is a loan within the statute. (1 *R. S.* 772, § 2; *Laws of* 1837, *p,* 486, § 1; *Comyn on Usury,* 156, 157, 159, 94; *Ord on Usury,* 26, 28; *Smith's Law of Cont.* 154; *Lloyd* v. *Scott,* 4 *Peters,* 224; *Chitty on Cont.* 702; *Nichols* v. *Fearson,* 7 *Pet.* 109; *Bank of U. S.* v. *Owens,* 2 *id.* 536, 7; *Beete* v. *Bidgood,* 7 *B. & C.* 453; *Silver* v. *Barnes,* 6 *Bing N. C.* 180; *Dunham* v. *Dey,* 13 *John.* 44.)

A loan may be disguised in the form of a sale of goods, &c. (*Lowe* v. *Waller, Doug.* 708; *Floyer* v. *Edwards, Cowp.* 112; *Jertons* v. *Brooke, id.* 796; *Bac. Abr. Usury,* (*C.*) *Wick's case;* 1 *Holt's N. P. C.* 256, *note; Ord on Usury,* 77, 8; *Parker* v. *Ramsbottom, Bailey J.* 3 *B. & C.* 257; *Hargreaves* v. *Hutchinson,* 2 *A. & E.* 12; *Eagleston* v. *Shotwell,* 1 *John. Ch.* 536; *Barker* v. *Van Sommer,* 1 *Br. Ch. R.* 149; *Brooke* v. *Middleton,* 1 *Camp.* 449; *Barbe* v. *Parker,* 1 *H. Black.* 283.) So a transfer of debt and credit, time being given, is a loan. (*Wade* v. *Wilson,* 1 *East,* 195.) So there may be a loan, part in money and the residue by a sale of other property, &c. (*Rose* v. *Dickson,* 7 *John.* 196; *Seymour* v. *Strong,* 4 *Hill,* 255; *Barbe* v. *Parker,* 1 *H. Bl.* 283.) Or a loan disguised by a sale of an annuity. (*Richards* v. *Brown, Cowp.* 776; *Earl of Chesterfield* v. *Janssen,* 2 *Ves. sen.* 142; *Murray* v. *Harding,* 3 *Wils.* 390; *Ord on Usury,* 64 *to* 66, 74, 5; *Marsh* v. *Martindale,* 3 *B. & P.* 154; *Furguson* v. *Spring,* 1 *A. & Ellis,* 576; *Fereday* v. *Wightwick,* 1 *R. & Myl.* 45.) A loan may be actually made, and in terms at legal interest, but usury disguised in the form of dry exchange. (*Ord on Usury,* 65.) A loan may be made at legal interest, in terms, the usury being reserved in some collateral matter. (*Bac. Abr. Usury,* (*C.*);

*Chit. on Cont.* 710.)   A loan of depreciated paper at par, &c. (*Bank U. S.* v. *Owens,* 2 *Pet.* 527.)

If on a loan of money the principal is really put at hazard, there can be no usury, whatever rate of interest may be reserved; but if the hazard be merely colorable it is otherwise.   The law in this respect, as in determining what shall constitute a loan, regards the substance and not the form of the transaction. (*Ord on Usury,* 38 *to* 41, 65, 73; *Bedingfield* v. *Ashley, Cro. Eliz.* 741; *Earl of Chesterfield* v. *Janssen,* 2 *Ves. sen.* 125; *Richards* v. *Brown, Cowp.* 770; 1 *Holt's N. P. C.* 256, *note; Byles on Bills of Ex.* 235; *Chit. on Cont.* 704; *Murray* v. *Harding,* 3 *Wils.* 390.)

Interest is allowed as a compensation for the use of the money loaned.   Hence the lender may contract to receive, under some circumstances, an amount beyond the legal interest for expense and labor in obtaining the money in hand to make the loan, or in remitting it to another place as desired by the borrower.   But the allowance can only be made as a compensation for actual expense and labor; for if the real design be to obtain more than legal interest, the transaction is usurious.   (*Ord on Usury,* 54 *to* 60; *Chit. on Cont.* 709; *Comyn on Usury,* 135, 136, 160; 1 *Holt's N. P. C.* 256, *note; Hammett* v. *Yea,* 1 *B. & P.* 151; *Carstairs* v. *Stein,* 4 *M. & S.* 192; *Palmer* v. *Baker, id.* 56; *Snydam* v. *Westfalls,* 4 *Hill,* 219, 220; *Stevens* v. *Davis,* 3 *Metc.* 211; *Byles on Bills of Ex.* 232, 3; *Chit. on Bills,* 101; *Hutchinson* v. *Hosmer,* 2 *Conn.* 341.)

It is not necessary, in order to constitute usury, that the person who advances the money should, himself receive, or contract to receive for himself, more than the legal interest on the loan; for, if by the arrangement an additional sum is to be paid or a collateral advantage is secured to any one else, it is equally usurious. (*Bank of U. S.* v. *Owens,* 2 *Pet.* 536, 7; *Meagoe* v. *Simmons,* 1 *M. & Mal.* 121; *Dowdall* v. *Lenox,* 2 *Edw. Ch. R.* 274; *Chit. on Bills,* 106.)

*D. Lord,* for respondents.   I. The arrangement was not a loan of money or of credit, but a commercial arrangement, hav-

ing an actual and *bona fide* dependence on, and reference to, a dealing in foreign exchange, and was rather an exchange of securities and an agreement for future delivery of exchange, than a loan. A colorable loan of money is fully denied, and is disproved. Each party negotiated with the expectation of an immediate sale of the securities it received; and even if such exchange were illegal, yet the evidence clearly is, that it was not a loan of securities. (*Rice* v. *Mather*, 3 *Wend.* 64; *Cameron* v. *Chappell*, 24 *id.* 94.) It had an actual and *bona fide* reference to foreign exchange at a future period. It was in fact a deposit of securities valued as money, on which the American Life Insurance and Trust Company were to issue their certificates as a trust company, and was so intended by both parties, and not intended as a loan. The supposition that the parties intended a loan upon usurious interest, when the securities on each side were meant to be immediately sold, is imputing to both parties a fraud upon the public, which is not to be credited. The arrangement involved real contingencies of political events, of the failure of foreign agents, of perils of the sea, and of the events of foreign commerce, which preclude the application of the law of usury. (*See Matter of Marsh*, 7 *Bing. R.* 150.)

II. On the supposition that the transaction was a loan of credit, there was no such reservation as constituted usury. (1.) The reservation, to constitute usury, must be to the lender, either directly or indirectly; and it must be for the loan or forbearance, directly or indirectly. (2.) The amount agreed to be paid to John Duer was, at the time, understood to be for his benefit, and not that of the American Life and Trust Company, and for his counsel fee, and not for the loan or forbearance. If excessive as a counsel fee, the Dry Dock Company had their remedy against John Duer individually. (3.) The sale of the 1000 shares was not intended for The American Life Insurance and Trust Company, and was not a premium for the loan or forbearance. (4.) The difference of interest between that in the certificates and the seven per cent to be paid by the company, did not constitute excessive interest; for the certificates, at the time they were agreed on, were worth par. (5.) The conver-

sion of pounds into dollars, at five dollars per pound, was not, as a matter of fact, enough to cover the ordinary charges of remittance. (6.) If a loan of credit is within the statute, interest at the statute rate is not unlawful. This is fully adjudged in *Dunham* v. *Dey*, (2 *John. C. C.* 182 ;) *Fanning* v. *Dunham*, (5 *id.* 122 ;) *Ketchum* v. *Barber*, (4 *Hill*, 225 ;) and the distinction is admitted in *S. C.* (7 *id.* 444 ;) *Stoveld* v. *Eade*, (4 *Bing. R.* 81.) All the reservations to the lender here would not amount to seven per cent per annum. The expense of remitting the amount of the certificates to London, would be three per cent.

III. By the currency, in the mutual obligations, and the place of payment stated in each, as well as by all the evidence in the case, it is proved that the parties contracted in reference to the law of England ; and there is no evidence that the transaction would be usurious by that law. (*Story's Con. L.* § 291 ; *Andrus* v. *Pond et al.* 3 *Pet.* 65 ; *Story*, § 393, 301–6, § 304 *a.*)

GARDINER, J. I agree with my brother Cady in the result of his opinion, without assenting to all the reasons upon which it is founded. To prevent misapprehension in a case of this importance, it may be proper to state the ground upon which I rest my judgment.

And 1st. The statute against usury, (1 *R. S.* 772, §§ 1 *and* 2,) prohibiting a greater rate of interest than seven per cent, " for the loan, or forbearance, of any money, goods, or things in action," is applicable, only, to those loans, which are in substance and effect, loans of money.

The statute of Henry VIII enumerated, and prohibited, the various devices and expedients adopted by money lenders, to evade the previous laws against usury. The statute of 12 Ann, from which our own is substantially taken, followed the earlier legislation upon this subject, by a partial enumeration of these devices ; while that statute, like our own, contains a general prohibition against taking, or securing, more than the legal rate of interest, *directly* or *indirectly*, for the loan or forbearance of any money, which rendered such enumeration unnecessary.

The true construction of the two last statutes, as I apprehend, is, and has been, that no more than the prescribed rate of interest should be taken, on a loan, or forbearance of money, *directly,* or *indirectly,* by way of loan of goods, or choses in action, or in any other manner. In a word, the statute would have been as comprehensive without the specifications of " goods and things in action" as it now is.

The terms " interest" and " forbearance" can not be predicated of any other than a loan of money, actual or presumed. Interest is defined to be a *certain profit* for the use of the loan ; and forbearance, the giving a further day, when the time originally limited for the return of the loan, has passed. (*Ord,* 30, 24.) Both imply that the thing loaned has an established value, so that the lender on its return, with the compensation fixed by law for the use and risk, may receive a " certain profit." Now this is true only of money, which is legally supposed to have a fixed, unchangeable value in itself, and to be consequently the true measure of the value of all other property. A fixed rate per cent on money, therefore, in contemplation of law, is supposed to give to the lender a " certain profit," because the thing loaned is of the same value at the end of the term as at its commencement.

This is not true, in fact, even of money. And the law does not affirm it to be true of any thing else. Accordingly, a loan of goods is not within the statute, whatever may be reserved for their use. (*Ord,* 26.) Nor of stock or grain to be returned in kind. (*Steptoe* v. *Harvey,* 7 *Leigh,* 500.) Nor of stock, converted into money, by arrangement to be replaced by other stock. (*Tate* v. *Welling,* 3 *T. R.* 538 ; 8 *East,* 304.) Nor of choses in action. (3 *T. R. supra.*) It is unnecessary to multiply cases. They all proceed upon the doctrine that the value of every thing which can be the subject of a loan, except money, is subject to fluctuation ; and, consequently, that an individual who loans five bushels of wheat, to receive ten after harvest ; or who, to sustain the credit of a friend, loans him a bond and mortgage for a month, may at the end of the term, from the depreciation of the commodity, or security, receive in value less

than he parted with, interest included. If credit is the subject of loan, as a chose in action, it is not an exception to the general rule above stated. Its value depends upon opinion, and is of all other things, perhaps, the most capricious and fluctuating. But credit is the "capacity of being trusted." It is no more a chose in action, or within the statute to prevent usury, than a capacity for the fine arts. The statute, by "choses in action," refers to a particular species of property, recognized by the law, and which, upon the death of the owner, would be inventoried as such by his legal representatives. Credit may be a benefit to the possessor as a means of procuring property, but is not itself recognized as property by the law. It can not be loaned; for a loan implies that the thing borrowed is to be returned after a temporary use to the owner, in specie or in genere. (*Ord.* 37.) Where, however, A. for a consideration paid by B. executes a letter of credit, a promissory note, or a guaranty, and delivers them to the latter to be used for his benefit, neither of them are choses in action in the hands of B.; and yet he has received precisely what he contracted and paid for, namely, the privilege of availing himself of A.'s credit with third persons. When the credit is used, and a trust obtained, its whole office is fulfilled; it becomes functus officio, and in the nature of things, can never be returned.

The credit of one person may be rendered available to another by gift, or sale, and in no other way. This may be done by a direct contract between the parties; as an exchange of notes, which is the sale of one promise for another; by an undertaking with third persons directly; or one to be used for the benefit, and according to the discretion of the donee or vendee. When the responsibility is incurred gratuitously, it is, in popular language, called a loan; and when for a consideration, a sale of credit.

In this sense, a sale of credit is no more within the prohibition against usury than a sale of merchandise. Accordingly in *Trotter* v. *Curtiss*, (19 *John.* 160,) and in *Suydam* v. *Westfall*, (4 *Hill*, 211,) it was held that a commission of $2\frac{1}{2}$ per cent for accepting, in addition to interest on the money advanced,

was not usurious. So where a bond and mortgage were sold for $2600, and the *bond* of the vendor given to the vendee, conditioned that the mortgagor should pay $3000, the amount of the mortgage. (4 *Hill,* 472.) So the sale of an *indorsement,* at 3 per cent, on the amount of a note intended to be, and which was discounted, at the legal rate, was held valid. *Ketchum* v. *Barber,* (4 *Hill,* 225.) And in *More* v. *Howland,* (4 *Denio,* 264,) it was decided that a guaranty was the subject of sale, and the price paid for it, immaterial. The principle of these cases applies to every engagement, direct or collateral, assumed in good faith, by one man for another, for a stipulated consideration. The exchange of notes for a premium greater than the legal rate of interest, is no exception to the general rule. This was in effect determined in *Dunham* v. *Dey,* (13 *John.* 40.) In that case, Dunham reserved 2½ per cent on an exchange of notes, which was more than the legal rate of interest. If this was usury per se, there was nothing for the jury to determine. But it was left to them upon the whole evidence, relating to the situation, and conduct of the parties, and they found, as a question of *fact,* that the exchange was a mere cover for an usurious loan, and the court sustained the verdict. In *Ketchum* v. *Barber,* (*supra,*) the referee found the other way, and the court pronounced the transaction lawful.

It is sometimes asked why should a man be permitted to receive ten per cent on an exchange of notes, when if he advanced money on the same security, he would get but seven. The answer is, for the same reason that he is permitted to receive $20 for six months' use of furniture, valued at $100. The one is prohibited the other not. No man can exchange his promise to pay $110 at the end of the year, for $100 in cash. 1st. Because he would thereby agree to refund in *kind* precisely what he had received, and this is the definition of a loan; and the $10 must therefore be a compensation to the lender for the use of the money, whatever name may be given to the transaction. This the statute forbids. The legislature have fixed the interest of money at 7 per cent. This includes a compensation

for the use, and the risk of its repayment. Nothing more can be received by, or secured to the lender. The consequence is, that a promise to pay $107 in a year, is in law, an equivalent for $100 in money presently received, no matter whether the promise is made by a Rothschild or a pauper. This is legally true because the legislature have so enacted. But they have not declared, that a promise to pay money is money, or its precise equivalent, in any case except that of a loan. Hence upon an exchange of promises, as in an exchange of property, parties are left to their own judgment as to their relative value. They are sales, subject to the same rules, and their validity tested in the same manner as other sales. Upon the sale of property on time, the purchase money becomes a debt which is forborne for the period limited by the credit.

Accordingly where usury is disguised under a sale of merchandise, the property in the goods passes to the vendee, but the excess of price over the just value, is considered as a premium for the forbearance of the debt, founded on a presumed loan of so much of the purchase money as is equivalent to the cash value of the commodity sold. (*See cases subsequently cited.*) The same rule applies to a sale or exchange of choses in action, or of credit, when the real object is a loan of money, although no money is received by the borrower. The law looking at the substance of the transaction, converts the substitute agreed upon by the parties, into money according to its cash value. This amount, constitutes the loan to the borrower, and the real debt due from him to the lender. If the securities received by the former are depreciated, the difference between the nominal and money value is so much interest for the forbearance of the debt. If they are equivalent to money, the usury is to be established by showing some direct collateral advantage to the lender, which would avoid a contract upon a loan of money.

In a word, neither sales of credit nor loans, or sales of property, other than money are touched by the statute. It is not enough that the vendee wants money, and that this is known to the opposite party. Neither the necessities of the vendee,

nor the use he contemplates making of his purchase, will deprive the vendor of his right to determine for himself, the terms upon which he will part with his property. (1 *Bro. Ch. Cases.*) His conduct may be oppressive; but all extortion is not usury. Nor can a penal statute designed to correct a particular evil, be made a remedy for the violation of all duties of imperfect obligation.

It follows that in every instance, where the contract in form is one of sale, or exchange, (and the principle applies to loans of chattels,) if the court in looking at the whole transaction can see, that the value secured to the vendor, was in good faith but the price of the thing sold, or exchanged by him, there can be no usury, whatever the price may be, or the mode in which it may be reserved. (*Bebee* v. *Bloodgood*, 4 *B. & Cress.* 453.) *Van Schaaick* v. *Edward*, 2 *John. Cases*, 356; 9 *Peters*, 378; 1 *Hill*, 227; 3 *Edw.* 146; 1 *B. & Pul.* 151.) Where however the object of the parties is a loan of money, and something else under the form of an exchange or sale is substituted for it, the principle of the loan, and consequently of the debt contracted by the nominal vendee, will be the value in money of the substitute received by him; and any consideration paid or secured to the vendor beyond that will in general be considered as interest for its forbearance. (1 *Bro. Ch. C.* 150; *Lowe* v. *Waller, Dougl.* 786; 2 *Camp. N. P.* 375; *Holt's N. P. C.* 295; *Comyn on Usury*, 94, 95.)

The true question therefore in the case before us is, whether the sum agreed to be paid by the complainants to the defendants, was in good faith the price of the certificates issued by the latter, or whether under color of an exchange, or a sale of securities, the object of the parties was a loan, in which the certificates of the insurance company were to be received in lieu of money, and for the forbearance of the debt thus created, the one party was to secure and the other ultimately to receive, more than the legal rate of interest.

The complainants, it will be seen, by reference to the facts, were to pay £50,000, for £48,000, received in certificates, valuing the pound sterling at $5, instead of $4,87, its true value. These provisions of the contract alone, would add more than

sixteen thousand dollars to the principal of the debt, which, with semi-annual interest at seven per cent, during the period of for bearance, was to be paid at the expiration of the credit.

If this had been a loan of money advanced by the trust com pany at the time of the agreement, it would have been mani festly usurious. If it is to be deemed a loan from the time when their certificates were *payable*, the result would be the same. If viewed, as the defendants insist it should be, as an exchange of securities, the question will be, whether the $16,000 above mentioned, or any part of it, was the stipulated differ- ence in value, between the certificates, and the bills of credit of the complainants.

Without adverting to the authority "to procure a loan" un- der which the agents of the complainants conducted the negoti- ation; or to the necessities of the complainants for ready money, and the knowledge of the trust company of their situation; or to the improbability that a suspended corporation were in the market, as bona fide purchasers of $250,000 of certificates, pay- able in one, and two years; or that with this object in view, they would have propitiated the agent of the trust company by a contract for stock on which a profit of $7000 was realized in addition to a counsel fee of $2500, for the examination of ab- stracts of title, and the draft of an agreement prepared by their own solicitor; it is enough that the other facts disclosed, repel any such presumption. And first, as an investment of money, the exchanged securities were equally valuable. That fur- nished by the complainants, was unquestionable. The trust deed covered real estate, in the city of New-York, under the eye of the trust company, valued by their own appraisers at one- half million of dollars. On the other hand, the certificates were not at a premium. The utmost that either party anticipated from their sale, was par; and the amount actually realized, was some $12,000 less than par. Indeed, an equal amount of mon- ey, deposited with the trust company, at any time during the negotiation, would have procured the certificates. Again, Mr. Duer states in his deposition, that the difference of £2000 was intended as a compensation to the trust company, for the *services*

they were to perform, and the *risks* they undertook. On reference to the trust deed, we find that they were to guaranty the bills of credit issued by the complainants; and pay them at maturity, as the express consideration for the contract of the latter. These were the services to be performed, and the risk incurred. But if the transaction was an exchange, the bills of credit became the property of the trust company. Mutual debts were created between the parties; each forming a consideration for the other. (2 *Denio*, 621.) The pretence of charging the Dry Dock Company a premium, because the trust company might, at some future time, for their own accommodation, guaranty bills which were their exclusive property, is a novelty in finance that was not seriously defended upon the argument.

The assumption however, is decisive evidence that no part of the $16,000 alluded to, was to be paid as the agreed difference in value between the exchanged securities. What then was the nature of the arrangement by which this large sum was secured to the Trust Company? The answer is found in the written agreement of the parties. The deed of trust purports on its face to be a security for the payment of the bills of credit, principal and interest, and each bill recites that the amount specified therein, is a "part of *a loan of* £50,000, secured on unencumbered real estate."

The solicitor who prepared the draft, and the more distinguished counsel who supervised his labors, were not ignorant of the distinction between a loan and a purchase, and they, as well as the parties for whom they acted, have denominated the transaction a *loan.* It was a loan. Not of the credit or responsibility of the Trust Company, for the contract was not that the complainants should return to the lenders credit, responsibility or certificates, in specie or otherwise, and pay for their use; but that they should pay a debt, principal and interest in money. Such a contract upon the part of a borrower, necessarily implies, that the thing loaned was money, or a substitute for it by the agreement of the parties. (*Ord,* 23.)

The trust company advanced their post notes (for their certificates are nothing else) as cash at their nominal value, which I

assume to be their value in money, in the same manner that a bank of issue would receive, and discount a note for a customer.

In both cases, there would be an exchange of promises. In each, the property in the notes issued, would vest in the receiver. In neither, would any money be paid. But in both cases, a substitute by the understanding of the parties is advanced by the lender, and accepted as money, by the borrower. Every transaction of the kind, when analyzed, will be found to be a loan of money, whether designed or not, under the form of an exchange.

If then, the transaction was a *loan*, as the agreement asserts, it follows, that the $16,000, above mentioned, must be held as a compensation, for the forbearance of a debt incurred by the complainants as *borrowers of money*, for which the certificates were substituted at the nominal, which was the true value by the understanding of the parties.

This being in addition to the 7 per cent, reserved by the contract, was usury. And the bills of credit and trust deed are consequently void. The decree of the supreme court should be reversed, and that of the assistant vice chancellor affirmed.

All the members of the court were of opinion that the contract was usurious, and a majority of them concurred in the reasons, and placed their judgment upon the grounds, stated in the opinion of GARDINER, J.

CADY, J. [After stating the material facts.] The inquiry in this case is, has there been a contract made between the complainant and the Trust Company, for the loan or forbearance of any money, goods, or things in action, whereupon or whereby there has been reserved or taken, or secured or agreed to be reserved or taken, any greater interest than is allowed by law?

It has already been shown, that by that part of the contract between the parties which has been stated, more than eight thousand dollars was agreed to be secured to the Trust Company, over and above all sums which that company was to advance or pay, with seven per cent interest thereon until such

sums were, by the terms of the contract, to be repaid. But it is said on the part of the Trust Company, that there was no loan of money, goods, or things in action, and therefore there could be no usurious contract.

Can there not be, directly or indirectly, a loan of money, within the meaning of the statutes against usury, unless the money is handed over before or at the time the contract for repayment is made? Suppose a man wishes to raise money to pay an execution of $1000, on which his farm is to be sold at the end of six weeks. He applies to a rich neighbor for *aid* to enable him to prevent a sale of his farm. He does not in terms ask for a loan of money, but he wants *aid* to prevent a sale of his farm; and both parties know perfectly well, that money is necessary to effect that object. The man who makes the application knows, that the person to whom he applies has no money on hand, but has undoubted credit. The man to whom the application is made, answers that he has no money, but says to the applicant, " Give me your bond and mortgage for $1200, payable in a year, with interest, and I will give you my written promise to satisfy the execution within six weeks, so that your farm shall not be sold." The bond and mortgage are given; the promise to pay the execution is made and performed. That would be a case in which no money would be put into the hands of the man who wanted *aid* to prevent the sale of his farm; yet who will say that there was not a loan of money within the meaning of the statutes against usury, and that the bond and mortgage, securing a premium of $200, over and above legal interest, were valid and free from the taint of usury? If not a direct, it would be an indirect loan of money. Suppose in the case stated, the person to whom the application was made, instead of giving a written promise to pay the execution, had agreed to give his check on a bank, payable in thirty days, for the amount due on the execution, would not that be a loan of money after the check was paid, and a loan of the check until it was paid? A check is in its nature a bill of exchange.

Grant, that although the complainant knew that the trust company had no money to loan, and that when it applied to

the trust company for *aid* to enable it to resume specie pay·
ments, it asked for such certificates of deposit as it received.
These certificates may be regarded as written promises to pay,
to advance, or to lend money at a then future day, and the mo-
ment these promises were performed, there was a loan of money.
The trust company was to advance money in the years 1839
and 1840, and give a day of payment until 1842-3-4 and 5.
Until the certificates were paid, there was a loan of *things in
action* within the letter and meaning of the statutes for the pre-
vention of usury ; and when paid there was a loan of money.
Unless this be so, the statutes against usury can be evaded by
giving a note payable in a short time, instead of handing money
to a man who wants *aid* to enable him to pay his debts. If in
this case, the trust company had handed over to the complain-
ant a sum of money, and received therefor notes to an amount
which, payable in from four to seven years, with interest at the
rate of six per cent per annum, payable half yearly, would more
than pay the sum advanced with seven per cent interest thereon,
could a lawyer be found who would say that the notes were not
usurious ? And is it possible that the trust company, as it had
no money to loan, could loan its certificates of deposit for a
greater premium, than it could specie, and not violate the laws
against usury ? Regarding the transaction between the parties
as a loan of things in action, or a loan of money, and it would
seem to be impossible to uphold it.

The cases referred to on the part of the trust company do not
prove that the agreement between the parties is exempt from
the imputation of usury. In the case of *Ketchum* v. *Barber
and others*, (4 *Hill*, 224,) the supreme court held, that a sale of
one's credit by way of guaranty or indorsement, though for a
compensation exceeding the lawful rate of interest, is not usuri-
ous, if the transaction be unconnected with a loan between the
parties. That, however, was not the unanimous opinion of the
supreme court. Justice Cowen held that it was usurious, and
when that cause was argued in the court for the correction of
errors, a majority of the members of that court, as appears from
a note of the reporter, were of opinion, that such a sale of credit

was usurious.   Chief Justice Nelson, in his opinion, says: "The case is therefore narrowed down to the question whether a *bona fide* sale of one's credit, or security for the use of and benefit of another, unconnected with a loan, is *per se* usurious." The learned chief justice might, as I apprehend, as well have said that, " the case is therefore narrowed down to the question whether a *bona fide* sale of one's *money* for the use and benefit of another, unconnected with a loan, is *per se* usurious."   A. goes to B. and says to him, I do not wish to borrow your money, but I wish to make a *bona fide* purchase of $200 : what will you ask, payable in two years ?   B. answers, I will sell you $200 for your note for $250, payable in two years ; and it is agreed to.   A. takes the $200 and gives his note for $250. The parties might call that a *bona fide* purchase of $200, unconnected with a loan, but the law would hold it to be a *loan* of money.   And, then, there is no such thing as a *bona fide* purchase of money, unconnected with a loan, when there is a contract to pay money at a future day.   So if A. should say to B., I wish to buy your note, payable in one year, for $200, and give you my note payable in two years—on what terms will you sell ?   B. answers, I will sell you my note for $200, payable in one year, for your note for $250, payable in two years.   A. makes the purchase, and both parties agree that it is a *bona fide* sale—unconnected with a loan ; but can their agreement alter the nature of the contract ?   The law will pronounce the contract on the part of B. to be a loan of his note for one year, and a loan of the sum of $200 for another year, no matter what the parties pleased to call the transaction.   In the case of *Ketchum* v. *Barber*, the plaintiff was asked to indorse a note, payable in four months, which would be a conditional promise to pay the note in case the maker did not.   He did indorse it, and received therefor 2½ per cent.   That was more than at the rate of seven per cent per annum.   Can it be believed that the legislature intended, that a man might sell or loan a conditional promise to pay, for a greater premium than he could an absolute promise, or than he could money itself ?   That case, however, may be distinguished from the one under consideration, in this, that in

that case there was no absolute promise to pay any sum at a future day; in this there were such promises; and such payments were from two to four years before the sums were to be repaid; and in that case too, the court held that the questions of fact had been found by the referee—which finding was to have the same effect as if found by a jury. Again, in that case, it might be said, that it was not contemplated that Ketchum was to make any advance in money; but in this case, such advance was expressly contracted for.

In the case of *Dey* v. *Dunham*, (2 *John. Ch. R.* 182,) it was held, that if on an exchange of notes, one party reserved a commission greater than seven per cent per annum, the contract would be usurious. I do not understand how the trust company can hope for any protection under that case. And in the case of *Fanning* v. *Dunham*, (5 *John. Ch. R.* 122,) the parties exchanged promissory notes, and the defendant reserved a commission of $2\frac{1}{2}$ per cent, which exceeded the rate of seven per cent per annum, and the transaction was held to be usurious and void by Chancellor Kent. In that case, the plaintiff's notes became due before the defendant's, showing that it was not intended that he should advance any money; and in the case of *Dunham* v. *Dey*, (13 *John.* 40,) the same principle was acted on by the supreme court. In that case, Spencer, justice, says: "Why was not this a lending on the one part, and a borrowing on the other, indirectly? We have the high authority of Lord Mansfield, that any contrivance, if the substance of it be a loan, will come under the word 'indirectly'". What is the difference between a man's lending his notes to raise money upon, taking more than legal interest, and lending his money? I confess I can perceive no other difference than this, that the borrower of the notes must probably pay more usury to get them converted into cash; but the transaction is substantially a lending of money, and I agree with the defendant's counsel, that if this course be tolerated the statute is judicially repealed. In that case, the notes given by the defendant to the plaintiff, were made payable before the notes given by the plaintiff to the defendant, so that had the defendant paid his notes as they be

came due, the plaintiff would have been kept in funds, and need not have been out of pocket a cent.   Thus, in that case, a loan of money was not contemplated.   But, in this case, a loan of money was provided for.   The trust company was to advance £48,000 sterling, on a credit of from five to six years.   In that particular, this case is more clearly within the statute than the case of *Dunham* v. *Dey.*

The trust company must be presumed to have intended to secure a much greater profit upon its certificates than seven per cent per annum, although it did not intend to violate any law by so doing ; but the court has only to inquire what was done. Whether the parties intended to violate the law, or not, is unimportant.   In the case of *Powell* v. *Waters, in error,* (8 *Cowen,* 696,) Colden, senator, said, " that the giving and receiving designedly, more than at the rate of seven per cent per annum for interest, is usury, although there be no corrupt agreement, other than that which is manifested by one party advancing and the other receiving the unlawful interest."   And in the case of the *Bank of Utica* v. *Wager,* (2 *Cowen,* 769,) Ch. J. Savage said, " That the taking usurious interest intentionally, is sufficient evidence of a corrupt agreement, and does not need an authority to support it."   In that case, the bank had taken $16\frac{1}{2}$ cents too much on a note of $1000 for ninety-three days. There was no evidence of any corrupt agreement, other than that which arose from the fact, that an excess of interest was taken.   In that case, the excess was at the rate of sixty-six cents a year on $1000 ; in this case the excess is much greater. In the case of *Mathews qui tam* v. *Griffiths and others,* (*Peak's N. P.* 200,) Mrs. Stewart drew a bill of exchange on her agent in London, for £600, payable to the defendants, or order, thirty days after date, for which they gave their note, payable three days after sight, at Fry & Robinson's, in London.   The defendants received a discount, at the rate of five per cent on the thirty days the bill had to run, but made no deduction on account of the three days the note had to run after sight, or the three days of grace which the bankers took thereon.   There was no evidence of a corrupt agreement, other than the facts above

stated. Lord Kenyon said he was clearly of opinion that this was an usurious contract, whether the person discounting the bill chose to receive a note or the money. In that case, a note was given for a bill, and the man who gave the note got the advantage by six days' interest, and he was held guilty of usury.

The distinction between the purchase of a note, and a loan upon it, is clearly stated by Jones, chancellor, in the case of *Powell* v. *Waters*, (8 *Cowen*, 685, 6, 7 :) " When the holder of a note has a right of action on it, he can sell it at what price he pleases, and the purchaser will succeed to his right of action ; but when the holder has no right of action on the note, and offers it for discount, whatever is offered for it, is by way of loan, on which no more than interest, at the rate of seven per cent, can be secured." The bills of credit made by the complainant, had no validity while in its hands. It offered them to the trust company, not for sale, as valid existing contracts, but to obtain a loan of some sort thereon ; and the trust company made a loan thereon of its promises to pay at a future day ; but upon a most extravagantly usurious premium. Jones, chancellor, at page 689 in the case last cited, said : " A note, after it has been negotiated, and put into circulation, may be sold by the holder to a stranger ; but it must be an operative contract, and the legitimate subject of a sale at the time it is taken, or the money advanced upon it will be a loan, and not the consideration of a purchase." The trust company, in its answer, says, that it was agreed that it "should purchase the said bonds, (bills of credit,) and in payment therefor should issue to the said bank their certificates of deposit, to the amount of forty-eight thousand pounds sterling, with the interest, redeemable at the time stated in the said bill of complaint." This was a loan of the certificates of deposit on the bills of credit—not a sale of them.

It is proved by the agents of the respective companies who negotiated the contract, that they did not intend to make a contract in violation of the laws against usury, and they must have been reckless indeed, knowingly, to put at hazard £50,000

sterling. But the defendants do not alledge that there was any mistake made in the contract, as to any matter of fact. It was made in all its parts as the parties intended, and it is of no consequence whethur they intended to violate the statute or not. The court must ascertain what they did ; and if they made a contract which secured to the Trust Company, directly or indirectly, for the loan of any money, goods, or things in action, more than at the rate of seven per cent, the court has no discretion ; it must pronounce the contract void, be the consequences to the parties what they may.

On the part of the Trust Company, it is now said : "That the arrangement was not a loan of money or of credit, but a commercial arrangement, having an actual and *bona fide* dependance on and reference to, a dealing in foreign exchange, and was rather an exchange of securities and an agreement for future delivery of exchanges, than a loan." This proposition does not throw much light on the transaction. When stripped of all unnecessary drapery, it was simply an exchange of promissory notes, or a loan of things in action, by the Trust Company to the complainant on its bills of credit, all payable in London—the amount of which need not be repeated, and by which the Trust Company secured to itself a very great premium.

Again, it is said that the transaction between the parties " was rather an exchange of credits than a loan." Can there be no loan or usury in a transaction which assumes the form of an exchange of credits ? A. makes a note payable to B. or order, for $400, payable in two years with interest, for which B. gives his note to A., for $300, payable in thirty days at a bank at which B. has unbounded credit. The transaction would, in form, be an exchange of credits, but in substance an usurious loan.

I have thus far confined my remarks to the exchange of notes or promises to pay between the parties, and I am constrained to say that the transaction between them was usurious, and the contract void.

But the exchange of notes was not the whole of the arrangement. In addition to the bills of credit made by the complain-

ant to the Trust Company, it gave to three· trustees a deed or mortgage of various lots of land in the city of New-York, to secure the payment of the said bills of credit. That deed was made by the complainant of the first part, the Trust Company of the second part, and the trustees of the third part. It is therein recited, that the complainant had determined to issue its sterling bills of credit for £50,000, payable in London, to the order of the vice president of the Trust Company, bearing interest at the rate of six per cent per annum, payable half yearly, on the 15th days of July and January in each year, and the principal sum payable as has already been mentioned ; and that the Trust Company had agreed to guarantee the payment of the said bills of credit and interest, as they became due ; and that the Trust Company had agreed to pay the said bills in London as they became due, "*without any charge for remittance, difference of exchange, commission or otherwise, the complainant agreeing to pay the Trust Company the interest on the said bills of credit, at the rate of seven per cent per annum, half yearly, valuing each pound sterling of the principal at the rate of five dollars, at least forty days previous to the time when the same should fall due*," and become payable in London, and also agreeing to pay to the Trust Company the amount of the said bills of credit, at least forty days previous to the time the same shall respectively fall due or become payable in London—and then for the purpose of securing the payment of the said bills of credit, the complainant by the said deed conveyed the said lots to the said trustees, in trust, in substance, that the trustees might sell, lease or mortgage the said lots, or any of them, to pay the said bills of credit and the interest thereon, in case there was any default on the part of the complainant in paying the same in the manner above specified.

There is no allusion in the deed to the certificates of deposit issued, or thereafter to be issued, by the Trust Company, and the bills of credit are mentioned as thereafter to be issued by the complainant. Judging from the deed, the only thing to be done by the Trust Company was thereafter to guarantee and pay the said bills and the interest thereon, as they became due and payable.

The contract on the part of the Trust Company, as set out in the deed was void. That company had no power to guaranty the payment of the said bills of credit, unless they were promissory notes or bills of exchange, previously discounted or purchased, and then held by the company or its agents.

After the Trust Company became the owners of the bills of credit, it is somewhat singular, that it should call on the complainant to compensate the company for guaranteeing the payment of its own bills. The company was under no obligation to negotiate the bills or send them to London, or anywhere else; and if the company wished to negotiate the bills for its own benefit, the complainant had no interest in that matter. The deed, however, was intended to secure to the Trust Company a very large profit on the transaction, beyond that which has already been noticed. In the first place, each pound sterling of principal and interest to be paid by the complainant, was to be valued at $5, instead of $4,87$\frac{1}{100}$, and this would give to the Trust Company nearly $8762. The interest was to be increased from six to seven per cent., and that increase would be $14,500; amounting to $23,262.

There is no necessity of resorting to this deed to prove the transaction usurious; but if the deed is to be regarded as a part of an entire contract, then the whole agreement must have been substantially this; that the complainant should give to the Trust Company its bills of credit for £50,000 sterling, payable in London, within from four to seven years, with six per cent interest per annum, payable half yearly, for which the Trust Company was to give to the complainant certificates of deposit for £48,000 sterling, payable in London, within from one to two years, with interest at five per cent per annum; and that then the complainant should give security by a trust deed or a mortgage, to pay the said bills of credit in New-York, forty days before they became due, and pay seven instead of six per cent interest, and pay five dollars for each pound sterling instead of $4,87$\frac{1}{100}$, thus securing to the Trust Company on the whole agreement more than $31,000 over all its advances. If such an agreement can be upheld, the statutes against usury

ought to be expunged from the statute book. An usurer will have nothing to do but lend his notes, instead of his money, and he may with impunity take what premium he pleases.

For the compensation secured to the Trust Company by the deed, that company agreed to pay the bills of credit in London, "*without any charge for remittance, difference of exchange, commission or otherwise, to the said New-York Dry Dock Company.*" How then, consistently with this covenant, can the difference of £2000 sterling between the bills of credit which the Trust Company · received, and the certificates of deposit which it gave, be accounted for?

The supreme court, in its opinion, says, "the transaction set forth in this case did not amount to a loan, nor is there any satisfactory evidence that it was a contrivance to cover up an usurious loan. It was either an open and mutual exchange of securities between the two companies, each intending to avail itself of the facilities thus afforded of raising money on the credit of the other, or it was a loan by the American Company of its responsibility and credit to the Dry Dock Company, in consideration of the compensation or premium reserved by the contract to the former, and of security given upon loan. We adopt the latter view, and regard the transaction as amounting to a loan of the credit of the American Company. The learned vice chancellor held that the certificates of deposit of the American Company, payable at a future day, were things in action and within the letter of the statute of usury. Let this be conceded, and the question then is, whether there may not be reserved upon these things in action, the same amount of premium as upon a loan of money? They are placed in the same condition with money or goods by the statute, and in our judgment are capable of being loaned with a reservation of interest." Notwithstanding the high respect I have for the distinguished justices who concurred in this opinion, I must be allowed to ask, whether if the Dry Dock Company had retained the certificates of deposit until they became payable, and had then received the money on them, there would not have been a loan of money? To the question asked by that learned court, whether there

may not be reserved upon these things in action, the same amount of premium as upon a loan of money, I answer, most certainly there can; but I deny that a greater premium can be reserved upon the loan of a promissory note, than upon the loan of money. The supreme court says, "but we are asked in the present case to declare the reservation of any premium whatever on a loan of credit to be unlawful," and then the court refer to numerous cases to show that it is lawful to loan one's credit, if on a premium not exceeding seven per cent for the time the bill or note has to run, and conclude by saying: "In this view of the subject, the premium reserved fell far short of the lawful rate." The supreme court has not given any data by which it can be ascertained what the court intended by the *premium*, and how it was determined, whether it exceeded or "fell far short of the lawful rate." The court did say, that the one per cent given to Mr. Duer, the 1000 shares of the stock of the Dry Dock Company, the difference between $5 and $4,86, in the value of the pound sterling, ought to be excluded from the estimate. How then is it to be ascertained whether the Trust Company did loan its certificates of deposit at a greater interest than seven per cent? Can it not be ascertained with arithmetical certainty? That Company issued its certificates of deposit, promising to pay without interest on the 1st day of July, 1839, £14,897,4,4 sterling, equal, at the rate of $5 to a pound sterling, to $74,486,09. On that day the company had promised to pay $6000, being the interest on $120,000 at five per cent; and also to pay without interest on the 1st day of October, 1839, £10,428,7,3 sterling, equal, at the rate of $5 to a pound sterling, to $52,141,82; and on the 15th of July, 1840, the company was to pay $120,000 principal, and $6000 interest. The company was to receive from the Dry Dock Company, after the 15th July, 1838, the interest on $250,000, at the rate of six per cent, payable half yearly, until the 15th of July, 1842, and then to receive $50,000 of the principal; and on the 15th of July, 1843, it was to receive $50,000 of the principal, and the same amount on the 15th of July, 1844, and the sum of $120,000 on the 15th July, 1845, the interest

on the sums unpaid to be paid half yearly, until the whole was paid. From these data it can not be difficult to ascertain whether the Trust Company was to receive more than the sums which it was to loan or pay; and seven per cent per annum thereon. If it was, then it follows that the contract was usurious and void. The question is not, whether the premium of ten thousand dollars, secured to the Trust Company more than seven per cent on its advances, but whether that premium, in connexion with the fact that the Trust Company was to pay five per cent annually, and receive six per cent half yearly, secured to itself more than seven per cent per annum, on the sums it agreed to advance. Unless I am wholly ignorant of the force of figures, the Trust Company secured to itself much more than seven per cent per annum, on all sums which it was to advance, and that the supreme court came to a wrong conclusion as to a matter of fact, in deciding that "the premium reserved fell far short of the lawful rate."

[The learned judge next proceeded to consider the question of variance between the case as stated in the bill and as established by the proofs. He came to the conclusion that there was no fatal variance as the law stood before the code of procedure took effect, and if there was, that it was now cured by the code. He therefore thought that the decree of the supreme court should be reversed, and that of the assistant vice chancellor affirmed.]

And thereupon the decree of the supreme court was reversed and that of the assistant vice chancellor affirmed.(*a*)

(*a*) This case was decided in December, 1849, when the opinion of Judge Cady was read. But a majority of the court not concurring in all the reasons stated by him, Judge Gardiner was designated to express their views, and his opinion, framed in accordance with those views, has been more recently obtained.