OSCAR L. RICHARD, ALBERT F. EGELHOFF, LEONARD W. SIMMONS and GEORGE N. RICHARD, Copartners, Trading as C. B. RICHARD & Co., Plaintiffs, *v.* AMERICAN UNION BANK, Defendant.

Supreme Court, New York Special Term, April 25, 1924.

Banks and banking — sales — actions for damages for failure to transmit credit to foreign country — transaction deemed sale — measure of damages — rule that special damage must be pleaded has no application to foreign exchange where transaction constitutes sale — motion to dismiss complaint denied.

In actions to recover damages for defendant's failure to transmit credit to a foreign country by reason of the depreciation in the market value of the foreign exchange, a motion to dismiss the complaint for failure to allege special damage will be denied, since the rule that special damage must be pleaded has no application to foreign exchange where the transaction is in the nature of a sale of a commodity.

The rule of damage to be applied is the difference (expressed in our own money) between the market price of the foreign currency on the contract date of delivery and the date of actual delivery.

MOTION by defendant to dismiss a complaint on the ground that it failed to state facts sufficient to constitute a cause of action.

*Max Silverstein,* for the plaintiffs.

*Lewis & Kelsey (Charles C. Pearce,* of counsel), for the defendant.

BIJUR, J. This is a motion by the defendant to dismiss the complaint on the ground that it does not state facts sufficient to constitute a cause of action.

The complaint alleges that on November 14, 1919, the Nemeth State Bank (defendant's predecessor) agreed, in consideration of the sum of $72,755, " to sell the plaintiffs 2,000,000 lei, and to transmit the same by cable forthwith for the account of these plaintiffs " to a bank in Roumania, " the same to be payable for the account of the plaintiffs on November 17, 1919; that by said agreement it was provided that the Nemeth State Bank would establish a credit in favor of said Roumanian bank for and on

behalf of the plaintiffs in said sum of 2,000,000 lei to be available and payable on November 17, 1919;" that said Nemeth State Bank failed to transmit, pay or deliver the said 2,000,000 lei or to effect the credit above referred to until May 27, 1921, and that plaintiffs were not notified thereof until August 17, 1921; that the market value of said 2,000,000 lei depreciated between November 17, 1919, and August 17, 1921, in the sum of $48,315; that the defendant assumed the obligations of said Nemeth State Bank, and that by reason of the premises plaintiffs have sustained damage in the sum named.

A similar transaction in consideration of $8,802.50 in respect of Jugo kronen and a bank in Jugo-Slavia is set out as a second cause of action alleging damage by depreciation of kronen between February 9, 1920, and November 23, 1921, in an aggregate of $5,752.

Defendant's first and second points are that the complaint is defective because it does not allege special damage, the implication being that upon the facts alleged plaintiffs are not entitled to general damages. In support of this contention defendant urges that the " Court of Appeals has unequivocally defined the transactions involved in cable and wireless transfers as executory contracts," citing *Equitable Trust Co.* v. *Keene*, 232 N. Y. 290, and *Gravenhorst* v. *Zimmerman*, 236 id. 22. I assume that defendant would have me draw the inference that, therefore, plaintiffs' allegations of a sale must be disregarded.

In view of the infrequency with which courts have been called upon, prior to the World War, to pass upon questions of foreign exchange, it is not strange that considerable difficulty has been experienced in deciding them. Moreover, even in banking and commercial circles, as noted by Sir George J. Goschen, *infra*, " the prevalent belief is that they are particularly abstruse and technical." Professor Cross, *infra*, says: " Foreign exchange has always seemed to be shrouded in mystery." In addition to this inherent embarrassment the court in the *Keene* case was concededly controlled by an agreed definition of foreign exchange which was wholly inaccurate, and was influenced by a statement of fact in the briefs which conveyed a totally wrong impression as to the actual practice of the financial community.

The great importance which the subject has assumed in recent years and the extensive litigation resulting therefrom render it desirable, if not imperative, that the true character of dealings in foreign exchange should be ascertained, preferably as the result of common-law proof in the course of a trial. In the immediate absence of such evidence, however, ample information for the present motion may be gleaned from the literature on the subject,

beginning with the two classics " The High Price of Bullion " (and Appendix), 1810, by David Ricardo; " Theory of the Foreign Exchanges " (1861), by Sir George J. Goschen, and continuing through modern works by Franklin Escher, Professors Albert C. Whitaker, Henry Gunnison Brown and Ira B. Cross, a lecture by J. Russell Butchart, at Adelaide, Australia (1923), and the latest book by Gustav Cassel.

In international trade the net result of purchases and sales between any two countries is invariably a debit balance in favor of one or the other, to liquidate which the debtors must pay the foreign money balance in the foreign country. The simplest form of such payment is of course the shipment of bullion. But an international banker, with deposits of the foreign money abroad, may give an order upon his account there, either in the form of a bill of exchange or commercial draft, or, as is frequently done in modern commerce, by a message transmitted by cable or wireless. *Legniti* v. *Mechanics & Metals Nat. Bank of N. Y.*, 230 N. Y. 415, 419. By this means the banker, in consideration of the payment or promise of payment of an amount of domestic money, agrees to furnish the foreign money at the foreign place of payment at a specified time. But foreign money is not, like domestic money, a measure or standard of value (Jevons, " Money and the Mechanism of Exchange "); we know its worth only by expressing it in terms of our own standard. Consequently, in respect of such transactions within this jurisdiction, foreign money has at least that characteristic of an ordinary commodity that its value must be measured in terms of our own money.

In *Gross* v. *Mendel*, 171 App. Div. 237, 240; affd., 225 N. Y. 633, the court wrote: " There is no reason, as it seems to me, why a different rule should be applied in the case of foreign money, where a recovery is sought here in our. money, than would be applied to contracts for the delivery of wheat, cotton or other specific articles of merchandise."

In *Equitable Trust Co.* v. *Keene, supra*, the Court of Appeals says, at page 294: " The principles involved are not different than those which would be applicable to a contract dealing with ordinary articles of personal property." See, also, *Murphy* v. *Kastner* 50 N. J. Eq. 214; *Lemon* v. *First Nat. Bank*, 216 Pac Rep. (Cal.) 620; the dissenting opinion of Shearn, J., in *Legniti* v. *Mechanics & Metals Nat. Bank of N. Y.*, 186 App. Div. 105, 111, 112; revd., 230 N. Y. 415; The Rate of Exchange in the Law of Damages, by Edward Gluck, 22 Col. Law Rev. 217, 235; 1 Sedg. Dam. (9th ed.) 730, § 373.

This brings me to the unfortunate definition in the complaint in

*Equitable Trust Co.* v. *Keene, supra,* by which since the case arose on a motion on the pleadings, the Court of Appeals said that it was " controlled." The pleader alleged: " * * * a cable transfer of exchange is a term used to describe the transfer of credits between different points by cable, the person contracting to deliver such exchange contracting that he will make available by cable to the person contracting to take such exchange a credit of the amount specified at the point specified and at the time specified."

Apparently the pleader had confused the relations between the customer and the banker with the operation of the latter. The customer does not open " a credit " with the banker here, but makes or agrees to make a payment of dollars to him. Whether, however, it was intended to indicate that the " credit " which is " transferred " is the customer's credit for dollars with the banker, or the latter's credit for dollars with some other financial institution here, it is an inexact and incomplete statement to say that it is " transferred " to London, for example. Even assuming that " credits " as such are involved at all, it is not the mere *transfer* of a dollar credit which the customer wants or the banker makes, but a *conversion* or *exchange* of a dollar " credit " here into a pound " credit," say in England.

But what did the pleader mean by " a credit of the amount specified? " In civilized countries to-day transactions effected by means of coin or other currency form less than ten per cent of the entire business done. Domestic & Foreign Exchange, by Prof. Ira B. Cross. The bulk of all financial operations is conducted by means of credit and credit instruments, largely checks. The fact, therefore, that the customer gives the banker here a check for dollars, that the banker thereupon delivers to the customer a check or similar order for pounds in London, and that in London the customer there may accept from the drawee a check for pounds (for, of course, pounds in England are " money " there) has no bearing upon the classification of the transaction, which in its last analysis is the conversion of dollar money into pound money — the latter being what the customer must have in order to make his payment or tender abroad.

Perhaps, however, the major vice of the definition is that it suggests that a banker can or does by some intangible means create a " credit " for money at a foreign point. The generic term " credit " is defined in *Dry Dock Bank* v. *American Life Ins. & T. Co.,* 3 N. Y. 344, as the " capacity of being trusted." But a credit for a specified sum of money is a very different and concrete thing, namely, a claim or cause of action for money. *Imperial*

*Curtain Co.* v. *Strauss,* 76 Misc. Rep. 533–536; *Wilde* v. *Mahaney,* 183 Mass. 455, 459, 460; *State* v. *Woodman,* 26 Mont. 348, 357.   In order to obtain such " a credit " abroad a banker, like any other person, must provide it by a deposit of the money there made either by himself or by some one for his account.

It is illuminative on this point that in *Chemical National Bank* v. *Equitable Trust Co.,* 201 App. Div. 485, the record discloses that in the agreed statement of facts upon which that case was decided the parties stipulated: " It is the custom of banks in the United States engaged in carrying on transactions in foreign exchange to keep on their books accounts which show the amount of foreign currency *which they have from time to time to their credit with banks in foreign countries."*

In passing it is interesting to note that when these balances (actual or potential) are exhausted or, as it is phrased in financial circles, when the rate of exchange becomes too unfavorable to the debtor country, exchange reaches the " shipping point "— that is, the bullion is physically transmitted.   Ricardo, *supra.*   This phase is rather significant of the fact that the aggregate of the operations in foreign exchange also result in the transfer of ownership of a commodity.

The actual transaction is no other than if an international merchant here gave a customer here in exchange for a certain amount of domestic money an order, in whatever form, for an equivalent amount of grain or other fungible · commodity abroad. No one would dream of designating this simple sale of grain deliverable abroad in complex terms of " credits " or " transfers of credits," and there is no reason why such an ·involved and fanciful definition should be employed to describe the agreement to deliver foreign money abroad in exchange for the receipt of a certain amount of domestic funds here.

It has been urged also that the banker may fulfill his obligation even though he has no foreign money abroad at the time of the making of the agreement.   I do not understand how this excludes the notion of sale.   The distinction between contracts of sale and contracts of manufacture seems to me to be manifestly inapplicable, but at all events it depends upon whether the goods are in existence at the time of the agreement (*Lee* v. *Griffin,* 1 B. & S. 272; *Cooke* v. *Millard,* 65 N. Y. 352, 357; Pers. Prop. Law, §§ 85, 86) and not upon their ownership at that time.

Nor do I see how the character of the transaction as a sale can be conditioned upon its being executed or executory — whether that classification turn upon the property in the goods passing (Williston Sales, § 2) or upon the postponement of delivery of

possession. A sale may well be executory in either sense. " In every contract of sale there is on the part of the vendor an obligation, not only to transfer the property in the thing sold, but also to deliver possession to the buyer." Cockburn, Ch. J., in *Calcutta & Burmah Steam Navigation Co.* v. *De Mattos*, 32 L. J. Q. B. (1863) 322, 335.

It is not surprising, then, that the Court of Appeals, deeming itself controlled by a vague, abstract and incorrect definition of the supposed subject-matter of the transaction, found great difficulty in applying to it a satisfactory legal designation. It pointed out, moreover, that it was " informed by the briefs " that the common method of conducting these operations was by word of mouth and that a requirement of written memoranda " would be productive of much inconvenience." Unfortunately, this information also was incorrect — inadvertently, I am sure. Bankers are apt to say that foreign exchange transactions are made by word of mouth. They are, however, in conformity with general banking practice, invariably " confirmed " before the close of the day by the interchange of written memoranda. Practical proof of this course is to be found in the fact that throughout the entire range of cases involving foreign exchange, *Equitable Trust Co.* v. *Keene, supra,* seems to be the only one in which the question of the Statute of Frauds has been raised; indeed, in many of the cases the opinions set out the written contracts at length.

The *Gravenhorst Case, supra,* so far as it has any immediate bearing, decided merely that as between the original parties a somewhat similar transaction was not an " executed purchase of a draft " or bill of exchange. Of course the payee does not " buy " the drawer's draft from the drawer; *as between them* it is merely an instrumentality for the delivery of funds. The relation is the same as that in the case of maker and payee of an ordinary check; it is a well-recognized rule that the check itself will not be regarded as payment unless expressly so agreed. *Thomson* v. *Bank of British North America,* 82 N. Y. 1, 8.

In contradistinction to the vague and incorrect abstractions of the definition in the *Keene* case, Mr. Escher in his " Foreign Exchange Explained," on page 308, says: " The rate of exchange is best defined as the price of the money of one country reckoned in the money of any other country. * * * "

Sir George J. Goschen, *supra,* writes: " It is necessary to examine the subject matter of the exchange itself and to realize distinctly what it is that is bought and sold, transferred or given in exchange."

In 23 Corpus Juris, 181, the word " exchange " is defined: " In

**7**

commercial law, a negotiation by which one person transfers to another funds which he has in a certain place,· either at a price agreed upon or which is fixed by commercial usage."

My conclusion is that the instant transaction is at least so closely analogous to the sale of a commodity that the rule of damages to be applied is the same, *i. e.,* that in .case of delayed delivery the " customer " is entitled to the difference (expressed in our money) between the market price of the foreign currency on the contract date of delivery and the date of actual delivery. *Mawhinney* v. *Millbrook Woolen Mills,* 234 N. Y. 244, 249; *Crocker-Wheeler Co.* v. *Varick Realty Co.,* 43 Misc. Rep. 645; affd., 104 App. Div. 568; *Mohn* v. *N. Y. & Penn. Smokeless Coal Co.,* 145 N. Y. Supp. 116. See, also, *Gerber* v. *Kalmar, Puck & Abrahams Consol., Inc.,* 104 Misc. Rep. 85.

Comparatively little light on the present question is to be derived from the leading cases on foreign exchange because they have approached the subject from altogether different and differing angles. Some are concerned with the problem whether plaintiff is entitled to rescind and recover back the amount paid to the banker or is relegated to an action for damages. In this class are *Katcher* v. *American Ex. Co.,* 94 N. J. L. 165; *Atlantic Communication Co.* v. *Zimmerman,* 182 App. Div. 862, and *Safian* v. *Irving National Bank,* 202 id. 459.

Some have turned upon the technical rules applicable to foreign bills of exchange as negotiable paper. *Pavenstedt* v. *N. Y. L. Ins. Co.,* 203 N. Y. 91; *Richard* v. *Connecticut Electric Mfg. Co.,* 200 App. Div. 681; and perhaps *Am. Ex. Co.* v. *Cosmopolitan Trust Co.,* 239 Mass. 249. The right of " re-exchange " accorded to the payee of a negotiable foreign bill of exchange protested for non-payment against the drawer (*Pavenstedt Case, supra*) is rather significant of the notion that similar transactions relating to foreign money are regarded as in the nature of a purchase. Re-exchange is there defined as " the additional expense of procuring a new bill for the same amount payable in the same place on the day of dishonor;" which is really only another term for the right to recover the market value of the foreign money contracted for at the time and place of agreed delivery.

Other cases again deal with the question whether the relation between customer and banker is that of debtor and creditor or one of trust. Such was the *Legniti Case, supra.* That point in particular was the subject of consideration by Dean Stone in his well-known article, " Some Legal Problems Involved in the Transmission of Funds," 21 Col. Law Rev. 507.

Still others are concerned with the question of the date as of

which the rate of exchange is to be calculated — a subject fully discussed by Mr. Gluck in the article, *supra*, 22 Col. Law Rev. 217, where practically all of the cases on that subject prior to the date of the article (March, 1922) are collated. Since that time the decisions in *Orlik* v. *Wiener Bank Verein*, 204 App. Div. 432, and *Hoppe* v. *Russo-Asiatic Bank*, 200 id. 460; affd., 235 N. Y. 37, may be added to the list.

Defendant's claim that special damage must be pleaded is no doubt on the analogy to the delayed payment or " withholding " or " detention " of domestic money for which the ordinary measure of damages is merely interest. 1 Sedg. Dam. (9th ed.) chap. 15. As I have pointed out, however, that rule has no application to foreign exchange because we are not dealing with delayed payment of " money " in its technical sense but of what is substantially a commodity.

Defendant cites two cases: 1. *Trusits* v. *Nemeth*, a decision by Mr. Justice Lehman at Trial Term, claiming that that was a similar case, and that damages were denied plaintiff in the absence of a plea of special damages. It appears, however, that defendant there had promised to pay or deliver the foreign money, not to the plaintiff, but to a third person, and that the learned justice held merely that the decline in value of the foreign money was not a *prima facie* damage to *plaintiff*, but that there must be pleading and proof of special damage *to him* apart from general damage to the third person, the payee. The other case is *Strohmeyer & Arpe Co.* v. *Guaranty Trust Co.*, 172 App. Div. 16, from which the following extract (to which I have added the first sentence) is quoted by defendant: " The transaction was a completed one, and plaintiff or its correspondent ultimately received precisely what defendant engaged should be received, to wit, 75,000 lire in Genoa. The inequity of plaintiff's claim can be appreciated by considering what would have been the rights of the parties if the fluctuations of exchange had been such that on November eleventh the value of one dollar in Italian lire had been more than five and two-tenths instead of less, and that, as in the present case, the delay in transmission had been due to no fault of the defendant."

It is plain, however (see p. 18), that that case turned on the single fact that the contract there involved expressly relieved defendant of liability in case of delay by the cable company and that the delay was admittedly so caused. The purport of the decision to that effect is recognized in a " comment " in 33 Yale Law Journal, Dec. 1923, 184, note 34. The dictum quoted is, however, now relied upon by defendant here. It may, therefore, not be inept to point out that the argument overlooks the fact

that the plaintiff there did *not* receive " precisely what " he had contracted for, because when he received it at a date later than the contract date its value had depreciated. Moreover, from the very hypothesis, had the value increased defendant would have no contractual or other right to recover the increased value from the plaintiff because the delivery at a later date would have been the wholly voluntary act of defendant.

Motion denied.

Ordered accordingly.