Rowan Advance Group LLC v DraftPros, LLC (2025 NY Slip Op 51581(U))

[*1]

Rowan Advance Group LLC v DraftPros, LLC

2025 NY Slip Op 51581(U)

Decided on October 7, 2025

Supreme Court, Washington County

Muller, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on October 7, 2025

Supreme Court, Washington County

Rowan Advance Group LLC, Plaintiff,

against

DraftPros, LLC TELCON HOLDINGS, INC., THE W-T GROUP, LLC,

KAREL GOMEZ, W-T ENGINEERING, LLC and PRATUM CONSTRUCTION SERVICES, LLC, Defendants.

Index No. EC2025-38978

David Fogel, PC, Garden City (David Fogel, of counsel) for plaintiff.

Epstein Ostrove, LLC, New York, (Elliot D. Ostrove, of counsel) for defendants.

Robert J. Muller, J.

Plaintiff commenced this action against defendants on May 30, 2025, alleging defendants breached the terms of their March 28, 2025 agreement labeled Sale of Future Receipts Agreement (hereinafter "Agreement"). Defendants DraftPros, LLC ("DraftPros"), Telcon Holdings, Inc. ("Telcon"), The W-T Group, LLC (W-T"), Karel Gomez ("Gomez"), W-T Engineering, LLC ("W-T Engineering") and Pratum Construction Services, LLC ("Pratum") (collectively, "defendants") move pre-answer to dismiss the complaint pursuant to CPLR §3211(a)(1)

Plaintiff alleges under the terms of the Agreement, the transaction at issue was described as a "purchase and sale of Future Receipts," with Future Receipts defined therein as "all payments made by cash, check Automated Clearing House ("ACH") or other electronic transfer, credit card, debit card, bank card, charge card or other form of monetary payment in the ordinary course of Seller's business." (NYSCEF Doc. No. 2, pg. 1). While DraftPros is identified as the purported Seller of its future receipts, an addendum to the Agreement also identifies Telcon and W-T as additional Sellers ("Sellers") "that have sold Future Receipts and granted [plaintiff] a blanket security interest." (id.)

Under the Agreement, the Sellers agreed to pay plaintiff $1,049,250.00 (defined as the "Purchased Amount") in exchange for $750,000.00 (defined as the "Purchase Price") from plaintiff. (id.). The Purchased Amount is labeled "the amount of [Sellers'] Future Receipts [plaintiff] purchas[ed] from [Sellers] at a discount." (id.). The Agreement assigns a "Specified Percentage" of 9.23%, defined as the "percentage of [Sellers'] Future Receipts [plaintiff is] entitled to receive until" the total Purchase Amount has been paid over to plaintiff. (id.).

Pursuant to the Agreement, plaintiff was entitled to $52,462.50 per week (defined as the "Periodic Amount"); the Periodic Amount was purportedly plaintiff's "estimate of the Specified Percentage" of Sellers' projected average sales revenue. (id.). Thus, the arrangement is predicated on the supposition that $52,462.50 per week represented just 9.23% of the Sellers' expected average sales revenue.

Plaintiff was to recoup the Purchased Amount by debiting the Periodic Amount every week from a bank account designated by Sellers for this purpose (the "ACH Account"), until plaintiff recovered the entire $1,049,250.00 Purchased Amount. (id.).[FN1]
All of Sellers' Future Receipts were to be placed in the ACH Account, and the Sellers made several representations, warranties and covenants about the ACH Account, including a covenant not to change the ACH Account, add a separate depository account, revoke plaintiff's access to the ACH Account, close the ACH Account or interfere with plaintiff's access to the ACH Account (the "No Diversion Clause"). (idat ¶11[a]). Relatedly, defendants Gomez, W-T Engineering and Pratum (the "Guarantors") agreed to, inter alia, ensure that Sellers did not violate the No Diversion Clause. (id. at ¶16[a]).

The Agreement nominally provides that plaintiff "assumes the risk" that, due to poor business performance, the Sellers would make payments more slowly than anticipated, or that the full "Purchase Price" would not be repaid in full at all. (id. at ¶5). However, the Agreement provides several avenues to ensure that plaintiff will be repaid, in full, if plaintiff decides that the Agreement had been breached. For instance, in the event of a purported breach of the Agreement, "[t]he Specified Percentage shall equal 100%. The full undelivered Purchase Amount plus all fees and charges . . . assessed under th[e] Agreement will become due and payable in full immediately." (id. at ¶13[a]). Furthermore, plaintiff is contractually empowered to extract money from any of the Sellers' depository bank accounts "wherever situated," without regard to whether the bank account was the ACH Account or whether it held the Sellers' Future Receipts. (id. at ¶13[d]). Additionally, the Authorization Agreement states, "[i]n addition, if Seller breaches the Agreement, Seller authorizes [plaintiff] to debit any and all accounts controlled by Seller or controlled by any entity with the same Federal Tax Identification Number . . . up to the total amount, including, but not limited to, all fees and charges". (id. at pg. 10)

In the first cause of action in its complaint, plaintiff alleges that, on or around May 23, 2025, "[p]laintiff received from its bank a return code indicating that [d]efendant's remittance, which was to be made on May 23, 2025 via ACH, failed because the [d]efendant instructed its bank to stop the payment . . . and thereby interfered with [p]laintiffs [sic] right to collect" its weekly payment, purportedly constituting a breach of the No Diversion Clause. (NYSCEF Doc. No. 1, ¶11). Plaintiff thus seeks $682,062.50 from the Sellers as "full uncollected Receivables plus all fees due" under the Agreement. (id. ¶¶12-13). In its second and third causes of action, plaintiff asserts that the Guarantors are likewise obligated to pay plaintiff $682,062.50, by operation of the guaranties they signed. (id. ¶¶16-21).

"A motion pursuant to CPLR 3211(a)(1) . . . may be properly granted only if the documentary evidence utterly refutes the plaintiff's factual allegations, conclusively establishing a defense as a matter of law. To qualify as documentary evidence, the evidence must be unambiguous and of undisputed authenticity'" (Koziatek v SJB Dev. Inc., 172 AD3d 1486, 1486 [3d Dept 2019], quoting Calhoun v Midrox Ins. Co., 165 AD3d 1450, 1450, [3d Dept 2018] [internal quotation marks, brackets and citations omitted]; see Doller v Prescott, 167 AD3d 1298, 1299, [3d Dept 2018]). "'Materials that clearly qualify as documentary evidence include [*2]documents reflecting out-of-court transactions such as mortgages, deeds, contracts, and any other papers, the contents of which are essentially undeniable'" (Koziatek v SJB Dev. Inc., 172 AD3d at 1487, quoting Ganje v Yusuf, 133 AD3d 954, 956-957 [3d Dept 2015] [citations omitted]; see Midorimatsu, Inc. v Hui Fat Co., 99 AD3d 680, 682 [2d Dept 2012], lv dismissed 22 NY3d 1036 [2013]). Where the complaint's allegations "are flatly contradicted by documentary evidence, they are not presumed to be true or accorded every favorable inference." (Rivietz v. Wolohojian, 38 AD3d 301, 301 [1st Dept 2007] [quotation omitted]).

To determine whether an agreement constitutes a loan, the transaction "must be considered in its totality and adjudged by its real character, rather than by the name, color, or form which the parties have seen fit to give it." (LG Funding, LLC v. United Senior Props. of Olathe, LLC, 181 AD3d 664, 665 [2d Dept 2020] [quotation omitted]; See also Fleetwood Servs., LLC v. Ram Capital Funding, LLC, 2022 U.S. Dist. LEXIS 100837, at 27 [S.D.NY June 6, 2022] ["The name, color, or form which the parties have seen fit to give an agreement are not dispositive . . . rather, the court considers the agreement in its totality and judges it by its real character to determine whether it constitutes a loan"], aff'd, 2023 U.S. App. LEXIS 14241 [2d Cir. June 8, 2023] [quotations omitted]).

In assessing a purported sale of receivables, the "court must examine whether the plaintiff is absolutely entitled to repayment under all circumstances," and, if the "principal sum advanced is absolutely repayable, the transaction is . . . a loan." (LG Funding, LLC, 181 AD3d at 665-66 [quotation omitted]; See also People v. Richmond Capital Grp. LLC ("Richmond"), 2023 NY Misc. LEXIS 5511, at 19 [Sup. Ct. NY Cnty. Sept. 15, 2023] ["A transaction is not a loan . . . where the risk of ownership has passed to the funder," but a transaction is a loan if "the obligation to repay the principal sum is absolute"]).

"Usually, courts weigh three factors when determining whether repayment is absolute or contingent: (1) whether there is a reconciliation provision in the agreement;[FN2]
(2) whether the agreement has a finite term;[FN3]
and (3) whether there is any recourse should the merchant declare bankruptcy." (LG Funding, LLC, 181 AD3d at 666). However, the "three factors provide only a [*3]guide to analysis. They do not dictate the conclusion, and a court need not find the presence of all three factors in concluding that a transaction is a loan." (Fleetwood Servs., LLC, 2022 U.S. Dist. LEXIS 100837, at 29; See also Advance Servs. Grp. LLC v. Arcadian Props. Austin LLC, 2021 NY Misc. LEXIS 1138, at 15 [Sup. Ct. Kings Cnty. Mar. 12, 2021] [deeming receivables purchase agreement to be a loan, despite finding the presence of only two of the three factors enumerated in LG Funding, LLC]). The "essential question under New York law is whether the contracting party is absolutely entitled to repayment under all circumstances [and] an agreement can be a loan notwithstanding the presence of a reconciliation provision and a non-finite term." (Fleetwood Servs., LLC, 2022 U.S. Dist. LEXIS 100837, at 30 [quotation omitted]).

Applying these standards to the Agreement at issue here, plaintiff's purported purchase of the Seller's receivables was nothing other than a loan. While the Agreement asserts that "THIS IS NOT A LOAN," and further proclaims that plaintiff "assumes the risk" of non-payment (NYSCEF Doc. No. 2, ¶5), such self-serving labeling must be discarded. (LG Funding LLC, 181 AD3d at 665). Indeed, in Richmond, the Court found similar language did "not matter" when compared against the reality of the transaction. (People v Richmond Capital Group LLC, 80 Misc 3d 1213[A] at n. 4, 2023 NY Slip Op 50975[U] [Sup Ct, NY County 2023]). Here, the "essential question" — whether plaintiff "is absolutely entitled to repayment" — must be answered in the affirmative. (Fleetwood Servs., LLC, 2022 U.S. Dist. LEXIS 100837, at 30).

Plaintiff assured that it would be absolutely entitled to repayment, because, if the Sellers "violate[] any term or covenant of" the Agreement, plaintiff can assert a claim for the "full undelivered Purchased Amount plus all fees and charges." (NYSCEF Doc. No. 2, ¶¶13, 13[a]). Such language belies the notion that plaintiff assumed any risk of non-payment. (See, e.g., Clever Ideas, Inc. v. 999 Rest. Corp., 2007 NY Misc. LEXIS 9248, at *6 [Sup. Ct. NY Cnty. Oct. 12, 2007] [finding a similar transaction to be a loan because, inter alia, "any default of the Agreements (including the restaurant's closing or bankruptcy) would trigger repayment"]). Furthermore, the Agreement does not limit plaintiff's right to collect against the Sellers or Guarantors, even if one Seller files for bankruptcy. Thus, the bankruptcy of one (or more) Seller is no impediment to plaintiff's recovery of every penny due under the Agreement.

Plaintiff further secured its absolute right to repayment under the Agreement because, if the Sellers violated any term or covenant thereof, plaintiff has the right to debit any of the Seller's banking accounts, "wherever situated." (NYSCEF Doc. No. 2, ¶13[d]) Notably, plaintiff's right to extract monies from any of the Sellers' bank accounts is not limited to accounts that actually hold the Future Receipts which plaintiff purportedly purchased. Plaintiff inserted similar language into the Authorization Agreement; specifically, in the event of any breach, plaintiff is authorized to: (i) "debit any and all accounts controlled by" the Sellers "or controlled by any entity with the same Federal Tax Identification Number as" the Sellers; and (ii) "contact Seller's financial institution and obtain information (including account number, routing number and available balance) concerning any other deposit account(s) maintained by Seller . . . and to initiate ACH transactions under this Authorization to such additional account(s)" (id. at ¶12). Plaintiff's purported right to collect any revenue from the Sellers, even if it is not a Future Receipt, demonstrates plaintiff's absolute right to repayment.

To further assure its repayment, plaintiff obtained a performance guaranty from three Guarantors, whom plaintiff has now sued for nearly $700,000.00. (NYSCEF Doc. No. 1, ¶¶16-21). The presence of Guarantors further reflects that the Agreement is a loan. (See, e.g., Clever Ideas, Inc., 2007 NY Misc. LEXIS 9248, at 5 [finding a similar transaction to be a loan because, [*4]inter alia, the lender "backed up the risk with [a] personal guarantee"]; See also Richmond, 2023 NY Misc. LEXIS 5511, at 8 ["it does not matter that the individual guarantors' guaranty of their business' MCA was a guaranty of performance and not of payment . . . the Predatory Lenders made sure they were getting repaid no matter what and that the risk of actual ownership of the accounts receivable never passed to the Predatory Lenders"]; Funding Metrics, LLC v. NRO Boston, LLC, 2019 NY Misc. LEXIS 4878, at 9 [Sup. Ct. Westchester Cnty. Aug. 28, 2019] ["the requirement that there be a guarantor liable under the Merchant Agreements, in this Court's view, belies [the] claim that the Merchant Agreements were in fact purchase and sale transactions"]).

For a transaction to constitute a usurious loan, it "must appear that the real purpose of the transaction was, on the one side, to lend money at usurious interest reserved in some form by the contract and, on the other side, to borrow upon the usurious terms." (Richmond, 2023 NY Misc. LEXIS 5511, at 19). "New York usury law is composed of General Obligations Law ["GOL"] §§5-501, 5-521; Banking Law §14-a(1) and Penal Law §190.40." (Adar Bays LLC v. GeneSYS ID, Inc., 37 NY3d 320, 326 [2021]). "Together, these statutes establish that loans of less than $250,000 to individuals cannot exceed a 16% annual rate, loans between $250,000 and $2.5 million cannot exceed 25% (the criminal usury rate) and loans of $2.5 million or more are not subject to usury laws." (id.) While GOL §5-521(1) bars corporate entities from raising "the defense of usury in any action," pursuant to GOL §5-521(3), the proscription does not apply where the corporate entity interposes a defense of criminal usury (i.e., an interest rate exceeding 25%, pursuant to Penal Law §190.40). "[L]oans proved to violate the criminal usury statute are subject to the same consequence as any other usurious loans: complete invalidity of the loan instrument." (Adar Bays, LLC v GeneSYS ID, Inc., 37 NY3d 32, 333 [2021])

Pursuant to the Agreement, plaintiff loaned the Sellers $750,000.00(with net proceeds of $713,625.00, after plaintiff deducted an "Origination fee" of $36,750.00).[FN4]
In exchange, plaintiff was to receive $1,049,520.00, in 20 weekly installments of $52,462.50. The difference between the amount loaned to the Sellers, and the amount to be repaid, is either $299,250.00 ($1,049,250.00 - $750,000.00, if using the gross loan amount) or $335,895.00 ($1,049,250.00 - $713,625.00, if using the net loan amount), either sum representing the interest plaintiff expected to receive on the loan. (See, e.g., Dry Dock Bank v. Am. Life Ins. & Trust Co., 3 NY 344, 355 [1850] ["Interest is defined to be a certain profit for the use of the loan"]).

Whether calculating plaintiff's interest rate using the gross loan amount of $750,000.00 or the net loan proceeds of $713,625.00, the result is the same: the loan is grossly usurious and therefore void ab initio. Using the gross loan amount of $750,000.00 and applying the formula: (Rate = Interest Received / [Principal x Time]), the result is an annual interest rate of 103.7% [*5](see NYSCEF Doc. No 11 — Simple Interest Calculation). Using the net loan amount of $713,625.00, the result is an annual interest rate of 122.4% (see NYSCEF Doc. No. 12 — Simple Interest Calculation). Regardless of which figure is used as the principal, the result is the same: a usurious interest rate of more than four times the criminal rate of 25%. Accordingly, plaintiff's loan is usurious under Penal Law § 190.40 and is therefore void pursuant to GOL §5511. (See also Adar Bays).

Plaintiff is impermissibly seeking to collect on a usurious loan. This court "will not be used as a cudgel to enforce potentially illegal and/or unconscionable loans." (Apex Funding Source LLC v Guard Forces LLC 2024 NY Misc. LEXIS 25067 at *13, 2024 NY Misc. LEXIS 25067 [Sup Ct, Washington County Oct. 3, 2024, No. EC2024-36956] [quotation omitted]).

Thus, having considered NYSCEF document numbers 1, 2, 6 through 12, 16, 18, 19 and 20 and after due deliberation thereon, it is hereby

ORDERED that defendants' motion for an order dismissing the complaint pursuant to CPLR §3211(a)(1) is granted and plaintiff's complaint is dismissed with prejudice; and it is further

ORDERED that any relief not specifically addressed herein has nonetheless been considered and is hereby expressly denied.

The above constitutes a Decision and Order of the court. The original has been e-filed by the Court; however, this shall not constitute entry or filing under CPLR §2220 and attorney for defendants is hereby directed to serve a copy of this Decision and Order upon defendants with notice of entry.

Dated: October 7, 2025
Lake George, New York
ROBERT J. MULLER, J.S.C.
ENTER:

Footnotes

Footnote 1:According to an authorization agreement appended to the Agreement ("Authorization Agreement"), the Sellers designated a total of six bank accounts as the ACH Account. (See NYSCEF Doc. No. 2 at pg.11)

Footnote 2:While the Agreement contains a reconciliation provision (NYSCEF Doc. No. 9, ¶4), the decision to grant reconciliation is based on the contents of a single month's statement of the ACH Account ("Reconciliation Information"), which does not suffice to paint an accurate portrait of the Sellers' Future Receipts or overall financial well-being (see id. ¶4[c]). Furthermore, whether to grant reconciliation hinges on whether plaintiff subjectively determines the Reconciliation Information is "reasonable." (id. ¶4[d]). "Illusory" reconciliation provisions cannot save a transaction from being deemed a loan. (Fleetwood Servs., LLC, 2022 U.S. Dist. LEXIS 100837, at *43-44).

Footnote 3:The Agreement, on its face, has a finite term. The Agreement calls for the Sellers to repay $1,049,250 in weekly installments of $52,462.50, resulting in exactly 20 weekly payments. The complaint alleges a sum due of $682,062.50, or exactly 13 payments of $52,462.50. (NYSCEF Doc. No. 1, ¶¶13, 15). It bears further noting that the complaint alleges a payment default on May 23, 2025 (id. ¶11), and plaintiff filed this action on May 30, 2025 — exactly one week after the alleged default.

Footnote 4:"In determining whether a loan is usurious, 'interest' is construed broadly." (Adar Bays, 37 NY3d at 336). Thus, when calculating the loan's interest rate, it is appropriate to factor plaintiff's retention of a $30,000.00 "Origination fee," since "all consideration to be paid in exchange for a loan should be valued when determining if a transaction is usurious." (id. at 337; See also GOL §5-501[2] ["The amount charged, taken or received as interest shall include any and all amounts paid or payable, directly or indirectly, by any person, to or for the account of the lender in consideration for making the loan"]).